CONDRON CO. v. CORRUGATED BAR CO.

(District Court, N. D. Illinois, E. D. April 16, 1919.)

No. 649.

1. PATENTS ☜42—IMPROVEMENT OF PRIOR ART BY ENGINEERING SKILL.
   Though a patentee might have made a better flat slab or shallow beam concrete floor construction than prior inventors, where the patent itself, apart from simplifying computation of stresses, simply proceeded along lines suggested by engineering skill, it was invalid.

2. PATENTS ☜328—PATENT FOR CONCRETE FLOORS—ENGINEERING SKILL.
   Sinks patent, of October 10, 1911, No. 1,005,756, relating to concrete floors for buildings, *held* invalid, as merely proceeding along lines suggested by engineering skill.

In Equity. Suit for infringement of patent by the Condron Company against the Corrugated Bar Company. Bill dismissed.

Arthur M. Hood, of Indianapolis, Ind., and Melville Church, of Washington, D. C., for plaintiff.

James A. Carr, of St. Louis, Mo., and Wallace R. Lane, of Chicago, Ill., for defendant.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SANBORN, District Judge. Infringement suit on the Sinks patent of October 10, 1911, No. 1,005,756, relating to concrete floors for buildings. The patentee thus states the object of his invention:

"It has heretofore been proposed to produce a monolithic building construction comprising reinforced concrete walls, supporting columns, and floors, and many different arrangements of the reinforcing metallic members have been provided, many of them with well-recognized fundamental expectation of introducing such reinforcing metallic members into those regions of the concrete which will, because of the load of the structure, either the weight of the structure or the applied load, be subjected to tension stresses, but, so far as I am aware, with perhaps one or two exceptions, the floor portions of such monolithic structures have comprised supporting beams having a depth materially exceeding their thickness, and these beams have, of course, formed downwardly projecting ridges below the ceiling surface, or lower surface of the floor, in such a way as to cast shadows upon the ceiling and thus materially reduce the intensity of light in the room. There have been few exceptions to this general practice, where a floor slab of uniform thickness, without beams of any kind, has been produced; but, so far as I am aware, the manner of placing proposed reinforcements in the floors of such constructions, as well as the manner of placing reinforcements in the floors and beams of the other structures to which I have referred, has been such as to make a careful analysis of the stresses due to the dead weight and to the applied loads practically impossible and a computation of the stresses difficult and inaccurate.

"The object of my present invention, therefore, is to produce a monolithic building structure, in which there shall be no supporting beams having a vertical depth exceeding the horizontal width, and in which the floor reinforcement and the supporting columns shall be so relatively arranged and proportioned that the stresses due to weight and applied load may be accurately analyzed and computed."

Like most patents for reinforced concrete, and practically all engineering computation, the aim was to simplify engineering analysis in placing the steel rods in regions of tension, in accordance with the well known property of concrete to be weak in tension and strong in compression. The patentee describes four "inclosing slabs" or shallow beams extending from column to column, supporting an "inclosed slab" in the center of the space bounded by the four columns.

Norcross (April 29, 1902, No. 698,542), to whose assignee both parties to this suit pay royalty, was first in the field with a flat floor slab construction, which is described by the Circuit Court of Appeals of the Eighth Circuit, in Drum v. Turner, 219 Fed. 188, 135 C. C. A. 74:

"The purpose of the invention patented to Norcross was to make in one panel or piece, extending throughout a building, however large, a monolithic flooring composed of a metallic network imbedded in concrete which would sustain itself and its load upon separated posts without the use of girders, floor beams, or other horizontal supports. The principle or mode of operation of the device by which this object was attained was to embed in a concrete flooring a metallic network consisting of strips of heavy wire netting which were laid lengthwise of the building, crosswise of the building, and diagonally over the tops of and supported by the columns, so that a strip lengthwise, a strip crosswise, and a strip laid diagonally would lie on or under each other over the top of each post in cobhouse fashion, and leave only small triangular spaces in any rectangular space between four posts free from this metallic network."

Three claims of the Norcross patent were sustained and held infringed by the structure of the Turner patents, Nos. 985,119 and

1,003,384. And in Turner v. Lauter (D. C.) 236 Fed. 252, Judge Orr followed the Drum Case, and decided that six claims of the Turner patent, No. 1,003,384, were anticipated by Norcross, as well as two claims of the Turner patent, No. 985,119. Other decisions along the same line are Turner v. Moore, 211 Fed. 466, 128 C. C. A. 138, and Turner v. Deere & Webber Co. (D. C.) 238 Fed. 377.

The gist of the Sinks invention, as expressed by him, is that in the Norcross and Turner constructions it was practically impossible to make careful analysis of weights, and to make a computation of stresses difficult and inaccurate.   These defects he proposes to supply by so arranging the reinforcement and columns that the stresses due to weight and applied load might be accurately analyzed and computed. It seems that this computation process is a growing one, developing and changing from day to day.   Mr. Condron says in his testimony that it must be varied to meet changing conditions of span, load, etc.

"One day we conformed to our original practice and modified [it] the next. We have modified our practice with growing knowledge of the art from 1903, when we began using reinforced concrete, until day before yesterday. We are learning more and more all the time, and conforming our practice to what we learn as we go along, up to this morning.   We do not act in conformity to the Sinks computation; that teaches nothing in the sense of computing or computation."

Mr. Condron further testified:

"Q. Do you mean, if you were to be employed as an engineer to put in the Akme system on a building, where the spacing of the columns was different from any spacing that you had occasion to use before, that you would have reason to redesign that thing?   A. I certainly would.

"Q. You would have to design it, and how would you begin?   A. I would design in an intelligent engineering manner, using my training and my knowledge of the art, my knowledge of mathematics or the knowledge of mathematics of the men in my employ.

"Q. You mean mathematics in the sense of computation?   A. Yes; as to computing it.

"Q. You do not act in conformity to the Sinks computation?   A. No, sir.

"Q. Never in the sense of computation; that teaches nothing about computing?   A. Nothing in the sense of computing or computation.

"Q. So that, so far as I understand, it is very largely a matter of judgment on the part of the engineer as to what he is going to use, how deep he is going to make his girder spans, or inclosing slabs or beams, whatever you call them, on any particular job, isn't it?   A. It is."

The witness further testified that—

"Sinks did not attempt, in connection with his invention, to propose and to invent how it should be calculated.   That was a thing any engineer might do who was intelligent enough to do it."

This case, therefore, presents the same condition as in Luten v. Washburn (Sept. 1918, Eighth Circuit) 253 Fed. 950, —— C. C. A. ——, where the court said:

"Neither the specifications, claims, nor drawings of the patents in suit give any specific directions as to where the reinforcing steel should be placed."

In December, 1909, at a meeting of the Western Society of Engineers, it seems to have been the general opinion of the engineers there present that the Sinks patent did actually simplify engineering prob-

lems. It appears that it is easier to compute stresses in a reinforced concrete construction, where the iron rods are placed at right angles to each other and to the column lines, than when they are diagonally placed, as in Norcross and Turner.

At that meeting Mr. Condron read the principal paper, which was then discussed by some of the engineers present. In this paper Mr. Condron claimed as one of the advantages of the Sinks construction that the stresses due to dead weight and all applied loads can be thereby accurately determined. This statement seems to have impressed his hearers, and several of them asked him to explain it. It was suggested that he explain the method of figuring the load at the edge of the enclosing slabs or wide beams. One of the speakers said:

"I believe quite a service has been done the profession in getting out a flat plate floor that permits of exact analysis. It is simply an extension of the beam and girder system of constructing reinforced concrete floors, because he uses wide shallow beams, and the broad panel surface is certainly pleasing and something that all owners want."

Another speaker said:

"I think the advantages of the girderless floor have been so well appreciated by the people who have been putting up these buildings that the principal thing in this paper is the fact that Mr. Condron and Mr. Sinks have given us something we can figure."

Another said:

"The most important thing of all, I think, is the fact that they are seeking to reduce the methods of computation to a more exact science than these have been in the past. There has been from the beginning so much mystery in reinforced concrete, and there has been so much made of the mysterious part of the thing in a commercial way, that in some places the use of the material has fallen into disrepute, because of being exploited by people who were not strictly honorable. If the design which Mr. Condron has shown to-night could be spread broadcast, and if it could be made perfectly clear that the methods of designing are precise and accurate, there is little doubt but that the use of flat ceilings, at any rate as he has shown them, would become very general. I think the best part of this paper will probably be a reply which Mr. Condron may be asked to make to the discussion to-night in the shape of giving us a little more exact details as to how his computations have been made. For instance, I think it would be very important for us to know how he provides for uniform distribution of load through his very wide girders, as his intersecting slabs are, of course, nothing but girders. It would also be interesting to know how he arranges for the distribution of the stresses through the central panel, and I trust that he will take pains to give us an answer in the discussion this evening, along these lines."

Mr. Luten, who has had many patent cases on his concrete bridge construction, also said in the discussion:

"The system which Mr. Condron has shown has developed from the slab and beam systems which we do not know how to compute, but the wide, flat, shallow beams, have extremely eccentric loadings, which is exactly the difficulty in the Turner system. It is due largely to the eccentricity of loadings that the computation of that system is so difficult, and it would interest me greatly if Mr. Condron could give us some additional details as to the exact difference between the two systems in methods of computation. If the loads are carried to the columns in two directions at right angles to each other, and in that way can be computed, could not that panel, or slab, then, be turned through 45 degrees, so that the lines of reinforcement and stress

run directly to the column, and thus assure us that the slab would have exactly the same strength as the other system? In other words, if Mr. Condron's method of construction is analyzable, does not that at once give a solution to Mr. Turner's system?"

Mr. Woodman:

"Mr. Chairman, I think that can be answered right here. While I am not very conversant with the details of the Turner system, it is my recollection of it that the girders that are within the slab are diagonal, running from column to column, crossing diagonally to the square of the rectangle. That being the case, there are two girders which are intersecting at the center, and there is therefore an indeterminacy which it is impossible to clear up, simply due to workmanship, if nothing else."

Another speaker said:

"But the principal thing that Messrs. Condron and Sinks should be commended for is that they have at last given engineers something tangible to work on, something that engineers can go to their clients with and tell them we have at last a floor of the kind that is a favorite with owners of buildings, capable of exact calculation, and that can be checked by any capable designer, and can also be tested, and the results will be as predicted."

After this discussion, Mr. Condron replied to the various points which had been raised. As to the questions in respect to methods of calculation, the report gives a synopsis of his remarks as follows:

"Regarding details of calculation, the speaker did not attempt to go into these, not considering it necessary. He said the entire design met the requirements of the Chicago building ordinance. When one describes a plate girder, and says it was designed in accordance with the specifications of the Maintenance of Way Association, engineers at once fully understand what was done. There is nothing peculiar or strange involved in this. It is an ordinary engineering problem of moments and stresses, and has been calculated just as you figure any moments and stresses, with the spans as they are given and the loads as they are required, and the moments resulting from these. The usual straight line formula was used for determining the sections of concrete and steel."

[1] In this situation the patent must be regarded in the light of any addition it may have made to the art, and nothing more. The purpose of the inventor is unimportant, except to aid in patent construction, or the presumption of its validity. The patent law has nothing to do with reasons or motives, but only with some art, machine, manufacture, or composition of matter. Fond du Lac Co. v. May, 137 U. S. 395, 11 Sup. Ct. 98, 34 L. Ed. 714. The patentee may have made a better flat slab or shallow beam construction than prior inventors, but the patent itself, apart from simplifying computation, simply proceeded along lines suggested by engineering skill.

[2] I think the patent is invalid, and that the bill should be dismissed.